# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

JOSEPH ZOREK                                    )
                                                )
            Plaintiff                           )
                                                )
      v.                                        )
                                                )
CVS CAREMARK CORPORATION                        )          JURY TRIAL DEMANDED
   Serve: CVS Caremark Corporation              )
   Legal Department                             )
   One CVS Drive                                )
   Woonsocket, RI 02985,                        )
                                                )
CVS PHARMACY, INC.                              )
CVS RX SERVICES, INC.                           )
PAXTON SQUARE CVS, INC.                         )
PENNSYLVANIA CVS PHARMACY, L.L.C.               )
   Serve: CT Corporate System                   )
   116 Pine Street                              )
   Suite 320                                    )
   Harrisburg, PA 17101,                        )
                                                )
            Defendants.                         )
_____)

## COMPLAINT

Plaintiff Joseph Zorek, by and through his undersigned counsel, hereby

brings this civil action against Defendants CVS Caremark Corporation, CVS

Pharmacy, Inc., CVS Rx Services, Inc., Paxton Square CVS, Inc., Pennsylvania CVS

Pharmacy, L.L.C. (collectively, "Defendants" or "CVS"), for unlawful discrimination

and retaliation on the basis of disability in violation of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and against CVS for unlawful

discrimination and retaliation on the basis of disability in violation of the

Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. §§ 951-963 (West 2011) ("PHRA"). CVS also wrongfully terminated Mr. Zorek's employment in violation of public policy in retaliation for his reporting Defendants' violations of PENNSYLVANIA CODE § 27.1, *et seq.*, which regulates the standards of practice for pharmacies licensed in Pennsylvania.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction with respect to the federal claims against Defendants pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

2. Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b)(2).

## PARTIES

3. Plaintiff is a citizen of Pennsylvania. Plaintiff formerly worked, at all relevant times, as Pharmacist-in-Charge/Team Leader ("PIC") at CVS Store # 1917 in Harrisburg, Pennsylvania.

4. CVS Caremark Corporation is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island, 02855. CVS Caremark Corporation is a direct parent corporation to CVS Pharmacy, Inc. and the ultimate parent corporation of CVS Rx Services, Inc. CVS Caremark Corporation transacts business in the Commonwealth of Pennsylvania. At all relevant times, CVS Caremark Corporation had at least 15 employees.

5. CVS Pharmacy, Inc. is a Rhode Island corporation registered as a foreign corporation in the Commonwealth of Pennsylvania, and transacts business

there. CVS Pharmacy, Inc. has its principal place of business at One CVS Drive, Woonsocket, Rhode Island, 02855, and is a subsidiary of CVS Caremark Corporation. CVS Pharmacy, Inc. owns, operates, or controls the pharmacy that employed Mr. Zorek.  At all relevant times, CVS Pharmacy, Inc. had at least 15 employees.

6. CVS Rx Services, Inc. is a New York corporation registered as a foreign corporation in the Commonwealth of Pennsylvania, and transacts business there. CVS Rx Services, Inc. is a subsidiary of CVS Pharmacy, Inc., which is a subsidiary of CVS Caremark Corporation.  Plaintiff's salary was paid by and through CVS Rx Services, Inc.  At all relevant times, CVS Rx Services, Inc. had at least 15 employees.

7. Paxton Square CVS, Inc., a Pennsylvania corporation, operated CVS Store # 1917, until January 1, 2010, when it merged into Pennsylvania CVS Pharmacy, L.L.C.  At all relevant times, Paxton Square CVS, Inc. had at least 15 employees.

8. Pennsylvania CVS Pharmacy, L.L.C., a Pennsylvania corporation, currently operates CVS Store # 1917. At all relevant times, Pennsylvania CVS Pharmacy, L.L.C. had at least 15 employees.

9. At all relevant times, Defendants were employers engaged in an industry affecting commerce under Section 101(5) of the ADA, 42 U.S.C. §12111(5), and Section 101(7) of the ADA, 42 U.S.C. § 12111(7).

10. At all relevant times, Defendants were covered entities under Section

3

101(2) of the ADA, 42 U.S.C. § 12111(2).

## FACTUAL ALLEGATIONS

11.     Mr. Zorek worked for Defendants and their predecessors from January 16, 1968 until his wrongful termination on July 5, 2012.  He was a dedicated and successful employee throughout his 44-year tenure.  For the 14 years prior to his termination, he worked at CVS Store # 1917 in Harrisburg, Pennsylvania. Most recently, he served as the PIC.

### Defendants Failed to Accommodate Mr. Zorek's Multiple Sclerosis.

12.     In 1989, Mr. Zorek was diagnosed with multiple sclerosis (MS), a physical impairment that substantially limited his ability to stand, walk, and lift heavy items.

13.     At all relevant times, despite having MS, with or without reasonable accommodations, he was able to perform all essential functions of the PIC position.

14.     As of January 1, 2007, then-District Pharmacy Supervisor Kevin Polifko, Mr. Zorek's direct supervisor; District Manager Pete Gaetani, Mr. Zorek's second-level supervisor; and Regional Sales Manager Michael Barto, Mr. Zorek's third-level supervisor, were all aware that Mr. Zorek had been diagnosed with MS.

15.     As of January 1, 2007, Defendants had made no effort to inquire whether Mr. Zorek needed any accommodations to assist him in performing his job.

16.     The pharmacy counter at CVS Store # 1917 was approximately five feet high. When Mr. Zorek was seated in a chair behind the counter, as he often was as a result of his MS, the counter blocked his view of the sales floor.

17.     In early 2007, Mr. Zorek provided his own reasonable accommodation by purchasing with his own money an electric powered mobility chair to help him more easily move around the pharmacy, and from behind the tall pharmacy counter to the sales floor at CVS Store # 1917.

18.     When seated in his mobility chair, Mr. Zorek was able to reach the pharmacy terminals and the telephone. Sitting in the mobility chair did not inhibit Mr. Zorek's ability to perform his job in any way. To the contrary, it made Mr. Zorek's job easier.

19.     Defendants were aware that Mr. Zorek had purchased the mobility chair, and that he used it while at work in CVS Store # 1917.

### Defendants Forced Mr. Zorek to Use an Elevated Lift Chair, an Ineffective Accommodation for His Disability.

20.     In March or April 2007, Mr. Barto, Mr. Gaetani, and Mr. Polifko planned to purchase for Mr. Zorek's use an elevating lift chair. The purpose of the lift chair was to enable Mr. Zorek to be able to view the sales floor and other areas of the pharmacy while in a seated position.

21.     In April 2007, Defendants purchased for Mr. Zorek's use a Clark Elevating Office Chair (the "lift chair") manufactured by Clark Medical Products, Inc.

22.     According to the product information available on the Clark Medical Products, Inc. website, the lift chair was intended and designed to "provide[] independent access to a standard desk or table" and "raise[] the chair seat to the user's standing level and lower[] the person to a normal sitting position."

5

23.     The lift chair is not intended or designed to be sat upon in a fully elevated position.  It is intended and designed to raise a seated user to a standing position, and to lower a standing person to a seated position.

24.     Defendants knew, or should have known, that the lift chair was not designed or intended to be sat upon while in a fully elevated position.

25.     Prior to purchasing the lift chair, Defendants did not consult with Mr. Zorek about whether he wanted the lift chair, or whether the lift chair would effectively accommodate his disability.

26.     Prior to purchasing the lift chair, Defendants did not engage Mr. Zorek in an interactive process to determine the most effective accommodation, and did not give Mr. Zorek a Reasonable Accommodation Questionnaire.

27.     Prior to purchasing the lift chair, Defendants did not ask Mr. Zorek for any medical documentation regarding possible accommodations, did not consult with any of Mr. Zorek's medical providers, and did not seek consent from Mr. Zorek to consult with any of his medical providers..

28.     Later in April 2007, Mr. Zorek was hospitalized for an unrelated medical emergency that exacerbated his MS.  He was on sick leave and short term disability leave for approximately two months.

29.     While he was out on leave, Mr. Zorek learned from a colleague that Defendants had purchased the lift chair and installed it in CVS Store #1917.

30.     On June 25, 2007, Mr. Zorek returned to work at CVS Store #1917 and saw the lift chair for the first time.  Following his two month absence for disability

6

leave, Defendants made no effort to inquire whether Mr. Zorek needed any reasonable accommodation to perform his essential job functions.

31.     During a meeting of CVS store managers in June 2007, Mr. Gaetani invited the assembled CVS managers to visit CVS Store #1917 specifically so they could see the "$7,000 chair" he had purchased for Mr. Zorek.  In the weeks following that meeting, several CVS managers came to CVS Store # 1917 and made remarks to Mr. Zorek about the lift chair.

32.     In Mr. Zorek's presence, Mr. Gaetani "joked" with Mr. Zorek's colleagues at CVS Store # 1917 that the money used to purchase the lift chair was taken from the money available for their bonuses.

33.     Defendants did not purchase the lift chair in an effort to accommodate Mr. Zorek's disability.

34.     The lift chair lacked a footrest, so when Mr. Zorek raised it to sit in a fully elevated position, his legs dangled uncomfortably in the air, causing significant pain and swelling in his legs and feet.  When the discomfort and swelling in his legs and feet became severe, he lowered the chair and used a shelf beneath the counter as a makeshift stool on which to prop his feet.

35.     When Mr. Zorek sat in the lift chair in a fully elevated position, as Mr. Gaetani required, it became unstable, and forced Mr. Zorek to sit in a leaning position to prevent him from falling out of the chair.  Sitting in this position for extended periods of time caused significant pain in Mr. Zorek's neck and right arm.

36.     Because the lift chair was so uncomfortable, and did not allow him to

move around the pharmacy and sales floor to interact with patients, Mr. Zorek instead sat in his mobility chair as much as possible during the period of June 2007 to January 2010.

37. In January 2010, Defendants issued the overall prescription sales metrics for CVS Store # 1917 for the 2009 calendar year. Mr. Gaetani and Mr. Polifko falsely blamed Mr. Zorek's disability for the fact that CVS Store # 1917's metrics were below the average of all CVS stores in Mr. Gaetani's district.

38. On January 21, 2010, Mr. Gaetani and Mr. Polifko issued Mr. Zorek a "Coaching and Counseling Form," in which they specified Mr. Zorek's "Actual Performance/Conduct" in part as "Store 1917 Pharmacy Triple [S] Score has been below the District average throughout 2009."

39. Mr. Gaetani and Mr. Polifko stated in the January 21, 2010 "Coaching and Counseling Form" that as a "Corrective Action," Mr. Zorek "must always have his lift chair set high enough so that Drop-off and Pick-up/Consultation are visible to him 100% of the time, and so that his patients may see him."

40. Following the issuance of the January 21, 2010 "Coaching and Counseling Form," Mr. Gaetani monitored Mr. Zorek's use of the lift chair, and demanded that at all times Mr. Zorek sit in the lift chair elevated to its highest possible position.

41. On several occasions, Mr. Gaetani telephoned Mr. Zorek during his shift at CVS Store #1917 and told him that he [Zorek] had been spotted not sitting in the lift chair, or not sitting in a fully elevated position.

8

42.     Upon information and belief, Mr. Gaetani asked his wife, as well as Gary Matsoni, a CVS Pharmacy Supervisor from another CVS district, to notify him after visiting CVS Store # 1917 whether Mr. Zorek was sitting in his fully elevated lift chair. Upon information and belief, Mr. Gaetani asked individuals other than his wife and Mr. Matsoni to notify him after their visits to CVS Store # 1917 if they saw Mr. Zorek not seated in his fully elevated lift chair.

43.     Mr. Gaetani used the lift chair as a bargaining tool, and told Mr. Zorek on several occasions that he would cut pharmacy technician hours if he did not sit in a fully elevated position in the lift chair.

44.     Mr. Zorek felt embarrassed and humiliated by his supervisors' compelling him to use the lift chair.  He also felt embarrassed and humiliated by Mr. Gaetani asking other individuals to monitor his use of the lift chair. He felt as though the lift chair was a "neon sign" advertising his disability.

45.     No other employees in CVS Store # 1917 were required to use the lift chair.  Even employees whose height made them unable to see over the pharmacy counter and shelving were not required to sit in an elevated chair.

46.     Throughout 2008 – 2011, Defendants held mandatory meetings for PICs in the CVS District Office in Lemoyne, Pennsylvania.  The  CVS District Office was not handicap-accessible.

47.     Prior to these mandatory meetings, Mr. Zorek told Mr. Gaetani that he was physically unable to attend because the CVS District Office was not handicap accessible. Defendants did not relocate the meetings to accessible locations, and did

not accommodate Mr. Zorek in any way so that he could participate in the meetings. Defendants did not even provide Mr. Zorek with minutes from the mandatory meetings.

48.     Defendants subjected Mr. Zorek to repeated, humiliating comments about his disability, thereby creating an intolerable working environment in an attempt to force him out of his job.

49.     During the period from June 2007 through July 2010, Mr. Gaetani made frequent derogatory references to Mr. Zorek's disability, including references to how difficult it must be for Mr. Zorek to perform his job without full use of his legs.  Mr. Gaetani often made these comments around the times of mandatory PIC meetings, which Mr. Gaetani knew Mr. Zorek could not attend because the meetings were not held in handicap-accessible locations.

### Defendants Understaffed CVS Store #1917, and Increased Risks to Patient Safety.

50.     As PIC, Mr. Zorek supervised four staff pharmacists and 21 pharmacy technicians.  Mr. Zorek typically worked 50–60 hours per week.

51.     In 2010 and 2011, the pharmacy in CVS Store # 1917 dispensed approximately 4,200 prescriptions per week, more than any other CVS store in its Sales District.  The pharmacy in CVS Store # 1917 is open 24 hours per day, seven days per week.

52.     In September 2010, Defendants installed a new pharmacy dispensing system in CVS Store # 1917.  The high volume of prescription activity in CVS Store # 1917, combined with the installation of the new pharmacy dispensing system and

the corresponding changes in business process, resulted in an extremely stressful and busy transition period for the pharmacists and technicians.  Mr. Zorek and his staff struggled during this busy transition to ensure that prescriptions were dispensed accurately and in a timely fashion, while keeping patient health and safety paramount.

53.     Defendants determined the number of pharmacist hours and pharmacy technician hours that were to be budgeted to CVS Store # 1917.

54.     In an effort to increase profits, Defendants cut the number of pharmacy technician hours in CVS Store # 1917, effective January 2011.

55.     In December 2010, Mr. Gaetani informed Mr. Zorek that the pharmacy technician hours in CVS Store # 1917 would be cut by approximately 20 percent, from 410 hours per week, to 340, starting in January 2011.  Mr. Zorek advised Mr. Gaetani that cutting the pharmacy staff in the area's busiest pharmacy, in which the volume of prescriptions dispensed continued to increase year-over-year, would likely endanger patient safety.

56.     Nevertheless, in early 2011, Defendants cut pharmacy technician hours in CVS Store # 1917 from 410 to 340 per week.

57.     Mr. Zorek observed that the reduction in staff hours forced pharmacy technicians to work under significantly greater time pressure, and resulted in pharmacy technicians making a greater number of mistakes in labeling and filling prescriptions.

58.     Dispensing an improperly filled or labeled prescription to a patient

11

could result in an allergic reaction, overdose, or other severe harm to patient health.

59.     Mr. Zorek repeatedly notified Mr. Gaetani that he had observed pharmacy technicians, as a result of the staffing reduction, making a greater number of mistakes in filling and labeling prescriptions.

60.     Mr. Zorek also told Mr. Gaetani that, because of the staffing reduction, there had been a marked increase in the number of incident reports filed with Defendants based on mislabeling and misfilling prescriptions in CVS Store # 1917.

61.     Mr. Zorek repeatedly asked Mr. Gaetani to return the pharmacy technician hours to December 2010 levels.  Mr. Gaetani refused, and stated that more pharmacy technician "hours are not the answer."

62.     In early 2011, Mr. Zorek worked 50 "base hours" per week as the PIC. Although he was paid for only those 50 hours per week, Mr. Zorek regularly worked 60 or more hours per week to ensure that the pharmacy ran smoothly and to protect patient safety.  In January 2011, after Mr. Gaetani ignored his concerns about the increased danger to patient safety resulting from the staffing cuts, Mr. Zorek offered to reduce his own base hours from 50 to 42 per week so that the cost savings could be used to pay for 35 extra technician hours per week, raising the total weekly technician hours to 375.  Mr. Gaetani agreed and reduced Mr. Zorek's base hours to 42 per week.  Although Mr. Zorek was then paid for only 42 hours per week, CVS Store # 1917 remained incredibly busy, so he continued to work 50–60 hours per week.

63.     Even with the 35 additional technician hours Mr. Zorek negotiated

12

from Mr. Gaetani, the inadequate pharmacy staffing levels in CVS Store # 1917 resulted in an increased rate of errors in dispensing prescriptions, which endangered patient safety by causing patients to receive the wrong medication or the wrong dosage of medication.

### CVS Threatened to Remove Mr. Zorek Because of His Disability and His Complaints about Insufficient Staffing and Patient Safety.

64.     On February 25, 2011, Mr. Gaetani and then-District Pharmacy Supervisor Keith Heim called a pharmacists meeting in CVS Store # 1917, during which they berated the pharmacists for not meeting the prescription sales metrics demanded by Defendants.

65.     During the meeting, one staff pharmacist, who had filled in for Mr. Zorek as PIC during his hospitalization in 2007, stated that she never wanted to be in charge of the pharmacy again, because Mr. Gaetani subjected the pharmacists and technicians to unreasonable time pressure, thereby increasing the likelihood of errors in filling and labeling prescriptions.  Mr. Heim replied that she need not worry about being in charge of the pharmacy because "we already have his [meaning Mr. Zorek's] replacement."

66.     Mr. Zorek had never stated an intention to leave his position as PIC. Nevertheless, Defendants were already planning to replace him.

67.     After the meeting concluded, Mr. Gaetani instructed Mr. Zorek thereafter to enter and exit CVS Store # 1917 through the front door, not the back door. Since purchasing the mobility chair in 2007, Mr. Zorek had used the store's back door because it gave him easier access to and from the pharmacy.  When he

left the store for the night, his wife would pick him up at the back door. He would ride his mobility chair out to the car. Once he was in the car, his wife would push the mobility chair back into the store, where it remained overnight. Mr. Gaetani gave this instruction to make it more difficult, if not impossible, for Mr. Zorek to do his job.

68.     Throughout March and April 2011, Mr. Zorek continued to emphasize to Mr. Gaetani the need to increase pharmacist technician staffing to reduce the likelihood of future incidents of mislabeling and misfilling prescriptions. Mr. Gaetani continued to refuse Mr. Zorek's request to increase staffing levels.

69.     On April 28, 2011, CVS performed a security audit at CVS Store # 1917, resulting in a failing score of 76 (a minimum of 80 was required). The auditor deducted points, in part, because during the overnight shift a delivery tote containing prescription narcotics was left on a pharmacy shelf, rather than locked in the pharmacy safe. The tote was placed in a section of the pharmacy that Mr. Zorek could not physically access, even with his mobility chair.

70.     On April 29, 2011, Mr. Gaetani met with Mr. Zorek in the break room of CVS Store # 1917 to discuss the failed security audit. Mr. Zorek told Mr. Gaetani that he was physically unable to access the part of the pharmacy where the tote of narcotics had been placed. By notifying Mr. Gaetani of his inability to access a part of the pharmacy, Mr. Zorek had effectively requested a reasonable accommodation.

71.     Mr. Gaetani ridiculed Mr. Zorek's disability by stating words to the effect of, "It's gotta be hard for someone who doesn't have good legs" to access the

14

part of the pharmacy where the tote was located.

72.     During the April 29, 2011 meeting, Mr. Gaetani asked Mr. Zorek if he was "happy."  Mr. Zorek replied that he was not happy with the problems caused by Defendants' unnecessary and severe cuts in staffing levels.  Mr. Gaetani asked Mr. Zorek if he would be happier at a "slower" store.

73.     Mr. Gaetani demanded that Mr. Zorek put in writing a request to be transferred to a "slower" store as a staff pharmacist, and to state that he was resigning his position as the PIC at CVS Store # 1917.  Mr. Gaetani threatened that if he did not resign, then Mr. Gaetani would issue written warnings for his purported performance deficiencies.  If Mr. Zorek agreed to resign, his personnel file would remain unblemished.

74.     Mr. Gaetani telephoned Mr. Zorek several times over the weekend of April 29–31, 2011, and each time demanded that he submit a letter of resignation from his position as PIC.

75.     Defendants' efforts to force Mr. Zorek from his position as PIC were part of a pattern and practice by Defendants to demote, force out and terminate the employment of individuals with disabilities.

76.     On May 2, 2011, Mr. Gaetani told Mr. Zorek that he and Mr. Barto had decided that Mr. Zorek could continue working in CVS Store # 1917 as a staff pharmacist.  Mr. Gaetani warned Mr. Zorek that he would "yank" him out of the store if he did not cooperate with the new PIC.

77.     Working as a staff pharmacist, rather than as PIC, would have

resulted in a reduction in Mr. Zorek's salary.

78.     On May 2, 2011, Mr. Zorek sent a letter to Lisa Bisaccia, CVS's Senior Vice President and Chief Human Resources Officer, in which he notified her that Mr. Gaetani and Mr. Barto were illegally discriminating against him on the basis of his disability.  He asked that CVS immediately investigate his allegations and take corrective action.

79.     The next day, on May 3, 2011, Mr. Gaetani telephoned Mr. Zorek at the pharmacy and said, "Joe, I thought we were friends.  You do what you need to do and I'll do what I need to do."  Mr. Zorek interpreted Mr. Gaetani's comments as a threat that he would retaliate against him for his reporting Mr. Gaetani's discriminatory acts.

80.     On May 4, 2011, Andreas Chandra, the new Pharmacy District Supervisor, visited Mr. Zorek at CVS Store # 1917 and observed the dangerous lift chair that Mr. Gaetani required him to use.  Mr. Chandra told Mr. Zorek that he would have the lift chair repaired so that it would no longer lean to one side.  Mr. Zorek told Mr. Chandra that the main problem was that the lift chair, even when functioning perfectly, was not a suitable accommodation.

81.     On May 4, 2011, Mr. Gaetani told Mr. Zorek that he would increase technician staffing at CVS Store # 1917 by 35 hours per week, but only on the condition that Mr. Zorek "sit up high" in the uncomfortable and dangerous lift chair. The increase in hours would return the pharmacy technician staffing level to 410 hours per week.

82.     In a May 12, 2011 email to Mr. Chandra, Mr. Zorek reminded him that the lift chair was not an appropriate accommodation, and asked him for assistance in obtaining a suitable replacement chair that would allow him to access his workstation.

83.     In early-May 2011, CVS reinstated the full 2010 staffing levels in CVS Store # 1917.  Pharmacy technician hours were returned to 410 per week.  In addition, CVS reinstated Mr. Zorek to 50 hours of pay, but kept his base hours at 42, resulting in a continuing reduction of his accrual of benefits.

84.     In May 2011, after the pharmacy technician hours were returned to 2010 levels, the pharmacy in CVS Store # 1917 received its highest Triple S (Sales, Service, Stock) score ever—a 93 out of 100.

85.     In mid-June 2011, Mr. Gaetani and Mr. Barto visited CVS Store # 1917.  During this visit, Mr. Barto congratulated Mr. Zorek on the pharmacy's May 2011 Triple S scores.

86.     During that same visit, Mr. Gaetani told Mr. Zorek that every CVS store has employees who are "donkeys" and employees who are "thoroughbreds." Mr. Gaetani told Mr. Zorek that it is necessary to "thin the herd" by getting rid of the "donkeys."  Mr. Gaetani made these statements in reference to a 75-year-old Pharmacy Technician in CVS Store # 1917.

87.     On June 23, 2011, Rita Rossi Martin, a CVS Regional Human Resources Manager, and C.J. Sanders, a CVS Employee Relations Representative, met with Mr. Zorek.  They informed Mr. Zorek that the technician staffing levels

that had just been returned to 410 hours per week were to be cut yet again.

88.     Mr. Zorek told Ms. Martin and Ms. Sanders that Mr. Gaetani had asked Mr. Chandra back in February 2011 to replace him as the PIC at CVS Store # 1917.  He also told Ms. Martin and Ms. Sanders that the lift chair was unsafe and physically harmful.

89.      Ms. Martin and Ms. Sanders blamed Mr. Zorek for the discrimination and retaliation he had endured, claiming that he had been "too accommodating." They also claimed, falsely, that Mr. Gaetani's discrimination and retaliation "had all been a big misunderstanding" on Mr. Zorek's part.

### Defendants' Harassment and Retaliation<br>Caused Mr. Zorek to Suffer a Severe MS Flare-Up.

90.     By late-June 2011, Mr. Zorek's physical condition had already deteriorated from the stress of the discrimination and retaliation, the threats to his job, and the lack of proper accommodations in the workplace.  As a result of sitting in the lift chair, he suffered increased swelling in his legs, and pain in his arm and neck, and generally had increasing difficulty performing everyday tasks.

91.     On June 28, 2011, Julie Emlet, an employee of Defendants, came to CVS Store # 1917.  Upon seeing that Mr. Zorek was not seated his lift chair, Ms. Emlet stated, "Oh, Joe—you're not in your chair!"  Ms. Emlet had no legitimate business reason to know that Defendants had required Mr. Zorek to sit in the lift chair at all times.

92.     On June 29, 2011, Mr. Zorek met with the neurologist who treated his MS.  Mr. Zorek described the stress and discrimination he suffered at work, and

told him about the pain and swelling in his legs, arm, and neck.  The neurologist

told Mr. Zorek that the symptoms were likely caused by the emotional stress from

his work environment, and by the physical stress caused by the lift chair.  The

neurologist prescribed medication and ordered Mr. Zorek not to return to work until

July 5, 2011.

93.     On July 5, 2011, Mr. Zorek returned to work.  Mr. Zorek felt as though

he had a target on his back, and that his actions were being closely scrutinized to

create a record for termination.  As a result of the ongoing discrimination and

retaliation, the almost-daily harassing calls from Mr. Gaetani criticizing his

performance, and his fear of losing his job, Mr. Zorek became increasingly

overwhelmed with anxiety, fear, stress, and depression.

94.     On July 6, 2011, Mr. Zorek's long-time personal physician

recommended that he take two weeks off from work.  During that two-week period,

Mr. Zorek suffered a severe flare-up of his MS.  Since being diagnosed with MS in

1989, he had only suffered one prior flare-up, in 1995.  The 1995 flare-up was mild,

however, compared to the flare-up he suffered in July 2011.

95.     The July 2011 flare-up significantly diminished Mr. Zorek's ability to

stand, walk, bend, lift, and care for himself.

96.     Mr. Zorek remained on disability leave from CVS from July 6, 2011 to

July 5, 2012.

97.     In the summer of 2011, while Mr. Zorek was on disability leave, Mr.

Gaetani instructed the Lead Pharmacy Technician at CVS Pharmacy #1917, to cut

the hours of the two oldest Pharmacy Technicians at CVS Pharmacy #1917, to fewer than 30 hours per week. The Lead Pharmacy Technician refused to do so, and told Mr. Gaetani that cutting the Technicians' hours to less than 30 hours per week would make them ineligible for health benefits.

98.    On October 17, 2011, Mr. Zorek filed a charge with the Equal Employment Opportunity Commission, alleging a continuing action of discrimination and retaliation based on his disability.

99.    The EEOC cross-filed Mr. Zorek's charge with the Pennsylvania Human Rights Commission, which deemed the charge filed on October 20, 2011, the date on which the EEOC received the charge.

100.    In January 2012, Mr. Zorek began to see a new neurologist, after his previous neurologist's practice closed. Mr. Zorek's new neurologist told him that the July 2011 MS flare-up was likely triggered by stress in the workplace, and by sitting in the lift chair for extended periods of time.

101.    On July 5, 2012, Mr. Zorek had used the one year of leave that CVS allowed its employees.

102.    Without determining whether Mr. Zorek could perform the essential functions of his job, or any job, with or without accommodations, and because he had used the one year of leave available to him, Defendants automatically terminated his employment on July 5, 2012, in violation of the ADA.

103.    On February 7, 2013, Mr. Zorek submitted an amended charge to the EEOC, and alleged that Defendants terminated his employment because of his

disability. On July 2, 2013, the EEOC issued the Notice of Right to Sue on Mr.

Zorek's amended charge, allowing him to file this Complaint.

104.    As of the date of filing of this Complaint, and as a result of Defendants'

discrimination, harassment, and retaliation, Mr. Zorek remains unable to walk, and

has extremely limited use of his right arm.

## COUNT I

### Failure to Accommodate in Violation of the
### Americans with Disabilities Act, 42 U.S.C. ' 12101 *et seq.*, and the
### Pennsylvania Human Relations Act,
### 43 PA. CONS. STAT. ANN. § 951, *et seq.*,
### Against All Defendants

105.    Plaintiff repeats and incorporates by reference all the allegations

contained in paragraphs 1 through 104 above.

106.    Mr. Zorek suffers from multiple sclerosis, and is a qualified individual

with a disability.

107.    Mr. Zorek was able to perform all essential functions of the position of

PIC, with or without accommodations.

108.    Defendants were aware of Mr. Zorek's disability, as evidenced by

Defendants' purchase of, and requirement that Mr. Zorek use, an electric lift chair.

109.    Defendants failed to engage in the interactive process, and failed to

provide Mr. Zorek with reasonable accommodations appropriate for his medical

condition.

110.    Instead, Defendants forced Mr. Zorek to use a lift chair in an unsafe

manner not intended by its manufacturer, thereby causing him significant physical

and emotional harm.

111.　Mr. Zorek's disability was a motivating factor in Defendants' decision to threaten to terminate, and ultimately terminate, his employment.

112.　Defendants' failure to accommodate caused Mr. Zorek financial harm by preventing him from working, causing him to use leave and leave without pay, and preventing him from earning any income.

113.　Defendants' failure to accommodate caused Mr. Zorek significant physical and emotional injuries.

## COUNT II

**Hostile Work Environment in Violation of the
Americans with Disabilities Act 42 U.S.C. ' 12101 *et seq.*, and the
Pennsylvania Human Relations Act,
43 PA. CONS. STAT. ANN. § 951, *et seq.*,
Against All Defendants**

114.　Plaintiff repeats and incorporates by reference all the allegations contained in paragraphs 1 through 113 above.

115.　Mr. Zorek suffers from multiple sclerosis, and is a qualified individual with a disability.

116.　Mr. Zorek was able to perform all essential functions of the position of PIC, with or without accommodations.

117.　Defendants were aware of Mr. Zorek's disability, as evidenced by Defendants' purchase of, and requirement that Mr. Zorek use, an electric lift chair.

118.　Mr. Zorek was subject to unwelcome harassment on the basis of his disability, including remarks ridiculing his disability and requiring and monitoring

his use of the lift chair.

119.    The harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive working environment.

120.    Defendants' harassment interfered with Mr. Zorek's ability to perform essential functions of his job, including but not limited to counseling and communicating with patients.

121.    Defendants knew or should have known of the harassment and failed to take prompt effective remedial action.

122.    The hostile work environment constituted an ongoing violation of Mr. Zorek's rights under the Americans with Disabilities Act 42 U.S.C. ' 12101 *et seq.*

123.    Defendants' harassment caused Mr. Zorek financial harm by preventing him from working, causing him to use leave and leave without pay, and preventing him from earning any income.

124.    Defendants' harassment caused Mr. Zorek significant physical and emotional injuries.

## COUNT III

**Unlawful Termination in Violation of the
Americans with Disabilities Act 42 U.S.C. ' 12101 *et seq.*, and the
Pennsylvania Human Relations Act,
43 PA. CONS. STAT. ANN. § 951, *et seq.*,
Against All Defendants**

125.    Plaintiff repeats and incorporates by reference all the allegations contained in paragraphs 1 through 124 above.

126.    Mr. Zorek suffers from multiple sclerosis, and is a qualified individual

with a disability.

127.    Mr. Zorek was able to perform all essential functions of the position of PIC, with or without accommodations.

128.    Defendants were aware of Mr. Zorek's disability, as evidenced by Defendants' purchase of, and requirement that Mr. Zorek use, an electric lift chair.

129.    On July 5, 2012, Mr. Zorek had used the one year of disability leave that CVS allowed its employees.

130.    Without determining whether Mr. Zorek could perform the essential functions of his job, or any job, with or without accommodations, and because he had used the one year of leave available to him, Defendants automatically terminated his employment on July 5, 2012, in violation of the ADA.

131.    Defendants' termination of his employment caused Mr. Zorek financial harm and emotional distress.

## COUNT IV

**Retaliation in Violation of the Americans with Disabilities Act
42 U.S.C. ' 12101 *et seq.*, and the
Pennsylvania Human Relations Act,
43 PA. CONS. STAT. ANN. § 951, *et seq.*,
Against All Defendants**

132.    Plaintiff repeats and incorporates by reference all the allegations contained in paragraphs 1 through 131 above.

133.    Mr. Zorek suffers from multiple sclerosis, and is a qualified individual with a disability.

134.    Mr. Zorek was able to perform all essential functions of the position of

PIC, with or without accommodations.

135.     Defendants were aware of Mr. Zorek's disability, as evidenced by Defendants' purchase of, and requirement that Mr. Zorek use, an electric lift chair.

136.     Mr. Zorek engaged in protected activity when he (1) sent a letter on May 2, 2011, to CVS's Senior Vice President and Chief Human Resources Officer, in which he complained that Messrs. Gaetani and Barto were discriminating against him on the basis of disability, and requested that CVS conduct an investigation and take corrective action; (2) complained in person to Mr. Chandra, the new Pharmacy District Supervisor, on May 4, 2011, that the lift chair was not a suitable accommodation for his disability; (3) sent an email to Mr. Chandra on May 12, 2011, reiterating his complaint that the lift chair was not an appropriate accommodation, and requested assistance in obtaining a suitable replacement chair; and (4) complained in person to Ms. Martin and Ms. Sanders, human resources staffers, on June 23, 2011, that the lift chair was unsafe and physically harmful to him.

137.     Defendants retaliated against Mr. Zorek by subjecting him to unwelcome harassment on the basis of his disability, including remarks ridiculing his disability and requiring and monitoring his use of the lift chair.

138.     The harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive working environment.

139.     Defendants' harassment interfered with Mr. Zorek's ability to perform essential functions of his job, including but not limited to counseling and communicating with patients.

140.   The hostile work environment constituted an ongoing violation of Mr. Zorek's rights under the Americans with Disabilities Act 42 U.S.C. ' 12101 *et seq.*

141.   Mr. Zorek also engaged in protected activity when he notified Mr. Gaetani on April 29, 2011 that he was unable to access the part of the pharmacy where the tote containing narcotics had been left, and thereby requested a reasonable accommodation.

142.   On and after April 29, 2011, Defendants retaliated against Mr. Zorek by demanding that he either resign his position as PIC or accept a written warning to be placed in his personnel file, which would affect the terms and conditions of his employment.

143.   Defendants took these actions in retaliation for Mr. Zorek's repeated complaints about Defendants' failure to provide a handicap-accessible workplace.

144.   Defendants' retaliation caused Mr. Zorek financial harm by preventing him from working, causing him to use leave and leave without pay, and preventing him from earning any income.

145.   Defendants' retaliation caused Mr. Zorek significant physical and emotional injuries.

## COUNT V
### Wrongful Termination in Violation of Public Policy
### Against All Defendants

146.   Plaintiff repeats and incorporates by reference all the allegations contained in paragraphs 1 through 145 above.

147.   Plaintiff was an employee of Defendants.

148.     In 2011, Plaintiff reported to Mr. Gaetani that the reduction in pharmacist technician staffing levels was resulting in an increase in dispensing errors, in which patients at CVS Store # 1917 received mislabeled and misfilled prescriptions.

149.     PENNSYLVANIA CODE § 27.18 requires a pharmacy to dispense prescription drugs in a container bearing a label that includes "the trade or brand name of the drug, strength, dosage form and quantity dispensed."

150.     A pharmacy violates PENNSYLVANIA CODE § 27.18, which regulates the standards of practice for pharmacists and pharmacies licensed in Pennsylvania, when it dispenses prescriptions with inaccurate labeling.

151.     The legislative scheme described herein reflects the public policy of the Commonwealth of Pennsylvania to require of pharmacists a measure of professional care so as to insure minimum standards of competency and to provide the public safe pharmacy care.

152.     Pennsylvania Code § 27.18 thus evidences a clear mandate of public policy for the Commonwealth of Pennsylvania to protect public safety and health by maintaining minimum standards of safe pharmacy care.

153.     At all relevant times hereto, Mr. Zorek discharged his professional duty of care faithfully and acted at all times in compliance with Pennsylvania Code § 27.18.

154.     On April 29, 2011, in retaliation for Plaintiff's repeated reports of the Defendants' violations of PENNSYLVANIA CODE § 27.18, Mr. Gaetani demanded that

27

Plaintiff resign his position as the Team Leader Pharmacist at CVS Store # 1917 and request to be transferred to another store as a staff pharmacist. Mr. Gaetani threatened that if Plaintiff did not resign from his Team Leader Pharmacist position, then he would create a written record of Plaintiff's purported performance deficiencies, suggesting that he would create a false record.

155. During May and June 2011, Mr. Gaetani, Ms. Martin, and Ms. Sanders attempted to force Mr. Zorek out of his position, by blaming him for the discrimination and retaliation, and by refusing to take actions to cease the harassment or to address his requests for reasonable accommodation. As a result of their escalating harassment, Mr. Zorek was forced to take disability leave, which ran from July 6, 2011 to July 5, 2012. During that period, Mr. Zorek attempted to ensure that Defendants would provide a reasonable accommodation upon his return from disability leave, but Defendants refused to do so, in an attempt to force him out of his position.

156. On July 5, 2012, Defendants wrongfully terminated Mr. Zorek's employment.

Wherefore, Plaintiff prays for:

A. An award to compensate Plaintiff for back pay for lost wages and benefits and front pay for denial of Plaintiff's expected future earnings;

B. Compensatory damages for physical and emotional injuries, humiliation, and damage to his professional reputation;

C. Pre- and post-judgment interest;

28

D.  Punitive damages for Defendants' reckless disregard of, and callous indifference to, his rights in an amount appropriate to the proof presented at trial;

E.  The costs of litigation, including reasonable attorneys' fees and expert witness fees;

F.  Such other relief as may be just.


Respectfully submitted,


s/ Solomon Z. Krevsky
Solomon Z. Krevsky, Esquire
Supreme Court I.D. #72719
CLARK & KREVSKY, LLC
20 Erford Road, Suite 300A
Lemoyne, PA 17043
szk@clark-krevskylaw.com
Phone: (717) 731-8600
Fax: (717) 731-4764
Counsel for Plaintiff Joseph Zorek


DATED: July 17, 2013

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

s/ Solomon Z. Krevsky
Solomon Z. Krevsky, Esquire
Supreme Court I.D. #72719
CLARK & KREVSKY, LLC
20 Erford Road, Suite 300A
Lemoyne, PA 17043
szk@clark-krevskylaw.com
Phone: (717) 731-8600
Fax: (717) 731-4764
Counsel for Plaintiff Joseph Zorek

DATED: July 17, 2013